CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

08/20/2018

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

| | | |
|---|---|---|
| JOHN P., | ) | |
| Plaintiff, | ) | Civil Action No. 3:17-cv-00036 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| COMMISSIONER OF | ) | By:    Joel C. Hoppe |
| SOCIAL SECURITY, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff John P. asks this Court to review the Acting Commissioner of Social Security's

("Commissioner") final decision denying his application for supplemental security income

("SSI") under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1381–1383f. The

case is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 3. Having considered the

administrative record, the parties' briefs, and the applicable law, I find that substantial evidence

does not support the Commissioner's decision. Therefore, I recommend that the Court grant John

P.'s Motion for Summary Judgment, ECF No. 14, deny the Commissioner's Motion for

Summary Judgment, ECF No. 17, reverse the Commissioner's final decision, and remand this

case for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g).

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether

substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); *accord* 20 C.F.R. § 416.905(a). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant

2

work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*,

858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of

proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to

prove that the claimant is not disabled. *See id.*

## II. Procedural History

John P. filed for SSI on December 12, 2013, alleging disability caused by social anxiety

and panic disorder; depression; a back injury; dystonic tremor; a neck injury; coronary artery

disease with angina; arthritis in his hands; stomach hernia; sleep apnea; deafness in his right ear;

and impaired memory, concentration, and comprehension, which were side effects of

prescription medication. Administrative Record ("R.") 103, ECF No 10-1. Disability

Determination Services ("DDS"), the state agency, denied his claim at the initial, R. 103–18, and

reconsideration stages, R. 120–35. On April 4, 2016, John P. appeared with counsel and testified

at an administrative hearing before ALJ William Barto. R. 41–69. At the hearing, ALJ Barto

explained that because John P. had a prior SSI application that was denied on September 28,

2012, he would consider September 29, 2012, as the start of the relevant period for the current

application. R. 42. A vocational expert ("VE") also testified at this hearing regarding the nature

of John P.'s past work and the availability of other work in the national economy. R. 61–67.

On April 20, 2016, ALJ Barto denied John P.'s application in a written decision. R. 20–

33. He determined that John P. had severe impairments of "lumbar degenerative disc disease,

coronary artery disease, migraine headaches, major depressive disorder recurrent moderate,

social anxiety disorder, and panic disorder." R. 22. John P.'s other impairments were deemed

non-severe, R. 22–24, and none of his severe impairments, either alone or in combination, met or

3

medically equaled a listing, R. 24–26. As part of the step-three analysis, ALJ Barto found that

John P.'s mental impairments caused mild restrictions in activities of daily living; moderate

difficulties in maintaining social functioning; moderate difficulties in maintaining concentration,

persistence, or pace; and no episodes of decompensation. R. 25.

As to John P.'s residual functional capacity ("RFC"), the ALJ found that he could

"perform sedentary work as defined in 20 C.F.R. § 416.967(a)"[1] except he could

> frequently use the bilateral upper extremities for pushing, pulling, handling, and
> the operation of hand controls. [John P. could] never climb ladders, ropes, or
> scaffolds, occasionally climb ramps and stairs, occasionally balance, stoop,
> crouch, and crawl, and frequently kneel. He [could] never tolerate exposure to
> hazards such as unprotected heights or moving mechanical parts. [He] require[d]
> the use of an assistive device for ambulation and balance. [John P. was] limited to
> simple, routine tasks with occasional contact with supervisors, coworkers, and the
> public. [John P. could] perform jobs in a static workplace with infrequent changes
> in tasks or processes that [were] explained to him in advance.

R. 26; *see also* R. 26–31. Relying on this RFC finding and the VE's testimony, the ALJ found

that John P. could not perform his past relevant work. R. 31. ALJ Barto concluded, however, that

John P. could perform certain sedentary jobs, such as addressing clerk, table worker, and

surveillance system monitor, that existed in significant numbers in the national economy. R. 32.

Therefore, ALJ Barto determined that John P. had not been disabled since September 29, 2012.

*Id.* The Appeals Council denied his request for review, R. 4–6, and this appeal followed.

### III. Discussion

John P. advances an assortment of challenges to ALJ Barto's decision, which can be

distilled into two overarching arguments: first, ALJ Barto erred in assessing John P.'s RFC, and

second, ALJ Barto erred at step five in relying on the VE's testimony. Pl.'s Br. 1–7, ECF No. 15.

---

[1] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying
[objects] like docket files, ledgers, and small tools." 20 C.F.R. § 416.967(a). A person who can meet these
lifting requirements can perform "the full range of sedentary work" if he or she can sit for about six hours
and stand and/or walk for about two hours in a normal eight-hour workday. *Hancock v. Barnhart*, 206 F.
Supp. 2d 757, 768 (W.D. Va. 2002); *see also* SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

As to the first argument, John P. contends that the ALJ did not properly evaluate his credibility or the opinion evidence. *Id.* at 2–6. As to the second argument, John P. asserts that "[b]ecause the hypothetical questions [posed to the VE] were not based on complete, specific findings as to all the non-exertional limitations . . . , the testimony of the [VE] about the existence of jobs is not valid and proper evidence of the existence of jobs which [John P.] could have performed." *Id.* at 4. These arguments are persuasive, and the Commissioner's decision must be reversed and the case remanded.

A.    *Relevant Medical Evidence, Opinion Evidence & John P.'s Report of Symptoms*

1.    *Physical Impairments*

John P. has a history of several physical impairments. On October 31, 2012, John P. established treatment with Erich Kiehl, M.D., his primary care provider, at the University of Virginia ("UVA") hospital. R. 449. John P. reported chronic daily low back pain, "'arthritis" in his bilateral hands," and occasional migraine headaches. R. 449–50. On physical examination, Dr. Kiehl observed a nodularity over the bilateral metacarpophalangeal joint ("MCP") with ulnar deviation, decreased flexion in the right hand, mild paravertebral tenderness over the bilateral lumbar spine, and grossly normal muscle strength and sensation. R. 451–52. Dr. Kiehl noted that John P.'s symptoms were "concerning for rheumatoid arthritis," but he would defer a diagnosis until getting lab results. R. 452–53. Dr. Kiehl also diagnosed chronic low back pain. R. 452. John P. followed up with Dr. Kiehl on January 16, 2013, with continued reports of back and hand pain. R. 440. Dr. Kiehl observed "knuckle malalignment over the right 4th knuckle" in addition to the same findings on the previous physical examination. R. 441. Most of John P.'s labs came back negative, R. 422, 441, which led Dr. Kiehl to remark that his hand condition was "increasingly unlikely to be inflammatory arthritis," but he ordered an X-ray to evaluate for

erosions, R. 442–43. The X-ray revealed no erosions or significant joint space loss. R. 371–73.

By April 16, Dr. Kiehl assessed John P.'s persistent hand pain not as arthritis, but as "hand

cramping." R. 422. During this visit John P. reported worsening of his condition, and Dr. Kiehl's

physical examination findings showed decreased finger flexion compared to prior exams, but no

ulnar deviation as previously noted; decreased range of motion of the hands; and marked

bilateral lumbar paravertebral tenderness. R. 421–22. John P. continued under Dr. Kiehl's care

through June 2014 and often complained of worsening or unchanged symptoms, R. 412, 524,

599, although he sometimes reported improvement, R. 405. Dr. Kiehl's findings on physical

examination remained the same or demonstrated worsening symptoms. R. 406, 413, 525, 599.

John P. completed one function report on May 6, 2014, as part of his application for

benefits. R. 249–56. He stated that he had a back injury, a neck injury, arthritis in his hands,

difficulty breathing when he slept, and coronary artery disease, for which he had two stents

placed in his heart. R. 249. He lived with his friend, Stephanie. *Id.* On a typical day, he watched

television, used the computer, and took naps. R. 250. He had no problem with personal care. *Id.*

He did some laundry. R. 251. He only left the house to go to doctor's appointments, which

Stephanie had to drive him to, or to sometimes sit on the porch. R. 252–53. He indicated

difficulty with lifting, squatting, bending, standing, reaching, walking, kneeling, climbing stairs,

and using his hands. R. 254. He did not know how long he could walk before needing to rest. *Id.*

He used a cane when his pain was bad enough, but it was not prescribed. R. 255. Stephanie

completed a Third-Party Function Report affirming John P.'s assertions. R. 226–33.

On June 19, 2014, Michael Greenberg, M.D., assessed John P.'s physical functioning as

part of the initial review of his SSI application. R. 104–13. Dr. Greenberg opined that John P.

could lift and carry twenty pounds occasionally and ten pounds frequently, could sit about six

hours and stand and/or walk about six hours during an eight-hour workday, and had unlimited

ability to push and/or pull (including operation of hand and/or foot controls), other than as shown

for lift and carry. R. 111–12. He could frequently kneel and climb ramps and stairs, occasionally

balance, stoop, crouch, and crawl, and never climb ladders, ropes, or scaffolds. R. 112. John P.

could only occasionally use his hands for gross manipulation (i.e., handling), but he had no other

manipulative limitations. R. 112–113. On November 4, R.S. Kadian, M.D., reassessed John P.'s

functioning as part of the reconsideration review of his SSI application. R. 121–31. Dr. Kadian

agreed with Dr. Greenberg's assessed exertional limitations, but he found different postural and

manipulative limitations. R. 129–31. Specifically, Dr. Kadian opined that John P. could

frequently balance, stoop, and kneel; occasionally crawl, crouch, and climb ramps, stairs,

ladders, ropes, and scaffolds; and frequently use his hands for gross manipulation. R. 130–31.

John P. continued to treat his back pain and headaches with other providers. On February

23, 2015, he saw Ross Buerlein, M.D., at UVA and reported experiencing an unrelenting and

"totally debilitating" migraine for most of February, as well as radiating lower back pain. R. 637.

On examination, John P. had "diffuse vertebral and paraspinal muscle tenderness" and "some

seemingly effort-dependent weakness" in the bilateral lower extremities, but he could walk with

a cane. R. 638–39 (parentheses omitted). Dr. Buerlein diagnosed cervical dystonia with chronic

back pain and associated migraines, switched Flexeril to baclofen and ordered sumatriptan for

the migraines. R. 639. John P. then treated with Reza Salajegheh, M.D., for an initial pain

management consultation on March 16. R. 643–47. John P. chiefly complained of low back pain,

but also reported progressively worsening weakness in the left lower extremity over the past few

months. R. 643. Physical examination revealed significant tenderness and diminished strength,

and John P. declined certain tests, such as sacroiliac joint provocative tests and a straight leg

raising test, as he could not perform them. R. 646–47. Dr. Salajegheh diagnosed chronic low

back pain, myofascial pain, and weakness of the left lower extremity, referred John P. to physical

therapy before starting a round of injections, and ordered an MRI of the lumbar spine. R. 647.

The MRI showed "mild right paracentral disc bulge and far left lateral disc protrusion at L4-L5

that abuts the right L5 and left L4 nerve roots and causes mild central canal stenosis" and "right

paracentral disc protrusion at the level of L3-L4 causing mild central canal stenosis." R. 694; *see

also* 662 ("[H]is MRI . . . showed some [degenerative disc disease] with mild canal stenosis, but

was otherwise reassuring."). On April 28, John P. continued to complain of low back pain, and

his providers decided to proceed with lumbar spine trigger point injections. R. 662–65. John P.

received at least eight rounds of trigger point injections through January 2016, which provided

only intermittent pain relief. R. 670–72, 676–77, 684–85, 696–700, 707–11, 716–20, 724–29,

738–44. John P. had a brief triage visit on January 20, 2016, during which he met with Anthony

Peters, M.D., about his back and neck pain. R. 732–37. On examination, he was tender to

palpation in the bilateral lower back, but not along the spine, and a straight leg raise test was

positive bilaterally. R. 735. Dr. Peters opined that John P.'s pain appeared to be chronic

myofascial muscle pain. R. 737.

John P. also testified about his physical impairments at the administrative hearing. He felt

he could not work because he needed a cane to walk, he had terrible migraines, both his hands

were getting worse, he had neck pain that also gave him headaches, and he had lower back pain.

R. 50–51. He got migraines, during which he could not see anything other than dots and flashes

of light, that lasted up to two days once or twice a week, and he estimated he had six to eight

multiday migraines each month. R. 55–56. His hands bothered him and made it hard to pick

things up and manipulate them, but his doctor could not prescribe medications because of the

potential hazards of mixing them with medications for his other impairments. R. 57–58. It hurt to grasp small objects, and he could write up to two sentences before his hand started burning and cramping. R. 58.

2.      *Mental Impairments*

John P. also has a history of mental impairments. On August 15, 2013, during a session for his neck tremor, Binit Shah, M.D., noted that John P.'s "major issue at [that] time," based on his complaints, was his pervasive anxiety, which triggered general body shakes, feelings of fatigue, difficulty concentrating, and general inability to perform household tasks. R. 409. Dr. Shah encouraged John P. to see a psychiatrist at UVA, started him on venlafaxine, and counseled him regarding his clonazepam. *Id.* On November 25, Dr. Shah noted that John P.'s major issue continued to be severe anxiety and panic attacks and that venlafaxine did not work, so John P. stopped after two months. R. 403. Dr. Shah again encouraged John P. to see a psychiatrist and recognized that "[c]ertainly with his anxiety it is well past my ability to offer much else." *Id.* On May 22, 2014, John P. told Dr. Shah he was feeling "better in terms of mood and overall outlook and optimism," although Dr. Shah still remarked that John P.'s cervical dystonia was "likely complicated by his significant mood issues." R. 597.

John P. also discussed his mental health symptoms in his May 2014 function report. R. 249–56. John P. indicated difficulty with concentrating, remembering things, understanding, following instructions, and getting along with others. R. 254. Regarding his socializing, he described having "panic attacks and social anxiety so bad that [he did not] like to go out in public or be around people." R. 249. He talked to family on the phone and to Stephanie when she came home from work. R. 253. He used to socialize with friends and go shopping, but could no longer do so. R. 254. Despite indicating difficulty getting along with others, he stated that he did not

have problems getting along with family, friends, neighbors, and authority figures. R. 254–55. As to his other difficulties, he needed various reminders, which he either wrote down in a notebook (for medication) or Stephanie would leave him notes on the bathroom mirror (for any housework). R. 251. His medications made him tired and impaired his concentration. R. 252. He did not drive because of his lack of focus, and as such, Stephanie had to drive him to doctor's appointments. R. 252–53. He could pay attention as long as he was not heavily medicated, and he followed instructions "ok." R. 254. He did not handle stress or changes in routine well. R. 255. Overall, John P. described his condition: "I feel like I'm in a fog all the time, very weak, can't focus most of the time. I forget things very easily. I have some notebook that I keep beside my chair to remind me when to take meds, sometimes when to eat or shave." R. 256.

On July 23, 2014, John P. presented to Faye Romano, Psy.D., for a mental health consultative examination. R. 607–11. He told Dr. Romano that he did "not go to public places and no longer socialize[d] with others outside his home due to anxiety," and when he did go out in public, his heart raced, he became soaked in sweat, and he felt lightheaded. R. 608. He described no activities beyond watching television, getting on the computer, making sandwiches or microwave meals, and taking care of personal needs. *Id.* He also reported "depressed moods, diminished motivation and interest, difficulty concentrating, a bleak outlook on life, poor self-esteem, isolation, and difficulty relaxing." *Id.* He denied suicidal and homicidal ideation, although he admitted to two past suicide attempts, for which he was hospitalized for four days, in 2007 and 2009 respectively. *Id.*

Dr. Romano observed that John P. "was attentive and responsive and was oriented to person, place, and object," although "[d]isturbances were noted in attention and concentration." R. 609. John P.'s affect and thought content were "appropriate to the situation," his "mood was

10

low, with no evidence of lability," "thought processes appeared intact and goal oriented," and his "intellectual ability [was] likely within the low average to average range." *Id.* John P. did not have difficulty with his "recent/long-term memory," but he did have difficulty with "short-term memory." *Id.* He recited the ABCs in forty seconds; repeated the days of the week backwards in twelve seconds; recalled digits forward to five numbers and backwards to four numbers and one out of three items after a five-minute delay; and counted "to twenty by two's" in twelve seconds. *Id.* He could not complete serial sevens and had "minor difficulty with simple abstract reasoning." *Id.* He was asked about current situations to gauge his judgment, and he "responded adequately to simple social and hazardous situations only." R. 610. John P. was cordial and cooperative throughout the interview. R. 609.

Based on her examination, Dr. Romano assessed major depressive disorder, recurrent, mild; social anxiety disorder; and panic disorder. R. 610. She concluded that he

> would not have difficulty following simple and routine task demands and would likely have difficulty completing complex tasks even under supervision. His ability to maintain regular attendance in the workplace, perform work activities on a consistent basis, and complete a normal workday or work week without interruptions appear[ed] to be impaired. His ability to interact with coworkers and the public, as well as coping with routine stressors encountered in [a] competitive workplace, appear[ed] to be impaired. [His] prognosis [was] poor given his history; however, [it] would be more favorable if he were to resume counseling. Given these findings, [John P.'s] complaint of functional impairment appear[ed] to be consistent at [that] time. Should [he] be awarded disability benefits, he may require assistance to manage his funds appropriately on his own.

R. 611. Dr. Romano also opined that John P. had "the ability to initiate and sustain social connections with others," but he was "not capable of adequate insight and judgment." R. 610.

On August 22, with the benefit of Dr. Romano's opinion, Barry Rudnick, M.D., assessed John P.'s mental functioning as part of the initial review of his SSI application. R. 104–16. Dr. Rudnick found that John P. had mild restriction of activities of daily living and moderate

difficulties in maintaining both social functioning and concentration, persistence, or pace. R. 110. He also concluded that John P. was moderately limited in his ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; respond appropriately to changes in the work setting; and be aware of normal hazards and take appropriate precautions. R. 114–15. Dr. Rudnick explained that John P. could "understand and remember three-step instructions," "persist, attend, and maintain acceptable pace for a normal work schedule," "accept supervision and . . . be capable of superficial and limited public contact," and "adapt to expectable workplace changes." *Id.* Joseph Leizer, Ph.D., reassessed John P.'s mental functioning on November 4 as part of the reconsideration review of his SSI application. R. 121–33. He also found that John P. had mild restriction of activities of daily living and moderate difficulties in maintaining both social functioning and concentration, persistence, or pace. R. 127. Dr. Leizer then reaffirmed Dr. Greenberg's conclusions, except he determined that John P. would also be moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them, and accept instructions and respond appropriately to criticism from supervisors. R. 131–33.

John P. continued to complaint to Dr. Shah about his mood. On August 28, 2014, Dr. Shah remarked that "he certainly has had a lot of issues with mood and this is the primary driver of many of his physical complaints." R. 602. On December 4, John P. stated that he had "been doing poorly in terms of depression recently" and "endorsed unformed, passive suicidality

stating that 'sometimes I wish I'd go to sleep and not wake up," but he "denie[d] any more concrete thoughts of self-harm." R. 629. On March 9, 2015, he complained of frustrated mood and increasing panic attacks. R. 641. Dr. Shah felt that a psychiatry referral was reasonable, but he would defer to John P.'s primary care provider. R. 642.

On March 16, based on statements made to Dr. Salajegheh during his pain management consultation, John P. was referred to Lisa Respaske, M.S.W., a social worker at UVA. R. 648. John P. expressed frustration that he had to see a psychologist later that week just because he had shared thoughts of hurting himself. *Id.* He told Ms. Respaske of his past suicide attempts, but denied an active plan, "stating [that] if he wanted to, he [had] access to locked guns." *Id.* He also described increasing panic attacks and anxiety levels because he relied on Stephanie for transportation, and she had to take off from work to drive him to his doctor's appointments, which put a strain on her. R. 649. He had tried to use an adaptive shuttle service, but ended up suffering a major panic attack. *Id.* Ms. Repaske observed short-term memory deficits during the interview, as John P. kept forgetting what he said to other providers. *Id.*

John P. also saw Lori Urban, Ph.D., a pain psychologist at UVA, on March 16 for a crisis intervention session. R. 651–53. On mental status examination, he exhibited or endorsed depressed mood, constricted affect, anhedonia, decreased motivation, feelings of hopelessness, poor insight, decreased concentration, decreased energy, irritability, oriented cognition, impaired memory, impaired decision making, and minimal risk of self-harm. R. 651–52. He did not have any feelings of guilt, crying episodes, racing or ruminative thoughts, reports of panic attacks, or risk of harming others. *Id.* John P. had minimal immediate response to intervention. R. 652. Dr. Urban diagnosed major depressive disorder, recurrent, moderate to severe. *Id.* John P. agreed to return for pain psychology intervention, and Dr. Urban noted that if he did "not continue to

13

contract for safety, he should be referred for inpatient hospitalization immediately." R. 653. John

P. returned for at least seven sessions with Dr. Urban throughout 2015. R. 653–57, 657–61, 666–

70, 672–76, 677–81, 685–89, 720–24. On mental status examinations during these visits, John P.

also displayed anxious and depressed mood, flat affect, and fair insight, and he reported feelings

of guilt, racing thoughts, ruminative thoughts, and somatic anxiety/panic attacks. *See* R. 655,

659, 68–669, 674, 680, 687–88. Dr. Urban elevated the major depressive disorder diagnosis from

"moderate to severe" to "severe without psychosis," and she added a diagnosis of social anxiety

disorder. R. 656, 660, 670, 675, 681, 689. Dr. Urban also elaborated on John P.'s condition. For

instance, on June 2, he did not recall "any part of [the] discussions from last session." R. 681. On

June 23, he reported running low on Klonopin because he took more than the prescribed dose to

deal with increased anxiety, and Dr. Urban noted "minimal progress toward change." R. 688–89.

John P. did report feeling better by his last session on November 5, and Dr. Urban's mental

status exam and diagnosis reflected improvement. R. 722–24. Nonetheless, he still displayed

irritability, racing and ruminative thoughts, somatic anxiety and panic attacks, and impaired

decision making on that date's examination. R. 722.

    Dr. Buerlein's treatment notes from mid- to late-2015 also addressed John P.'s mental

condition. On July 2, Dr. Buerlein noted that John P. was getting about ninety Klonopin pills per

month, to which Dr. Buerlein stated that "no one needs [that] much benzodiazepine, especially if

his needs are increasing. He needs assistance from psychiatry if his anxiety is this bad." R. 689–

90. On July 16, John P. reported worsening anxiety as he had been running out of Klonopin, and

he needed Klonopin any time he left the house or dealt with any visitors. R. 691. Dr. Buerlein

remarked that John P.'s behavior had been "relatively erratic at his other doctor visits." Dr.

Buerlein observed John P. to be very anxious appearing and that he "los[t] his train of thought

easily." R. 693. Dr. Buerlein assessed severe depression with history of suicide attempts, severe

anxiety with agoraphobia, and possible hypomania, and he explained that John P.'s "severe

anxiety [was] only progressing." R. 694. Dr. Buerlein increased John P.'s seroquel to help deal

with the severe anxiety. *Id.* On October 30, John P. reported improved mood, and Dr. Buerlein

noted it was the best he had ever seen him. R. 711–14.

At the administrative hearing, John P. said he would "rather not" talk about his "frame of

mind" and how he "fe[lt] about life." R. 60. He said he felt every day as if he would "rather not

be living." *Id.* His attorney did not ask John P. any further questions regarding his mental state,

and the ALJ had to pause the hearing because John P. had a panic attack. R. 60–61.

B.    *Analysis*

1.    *RFC*

John P.'s first overarching challenge pertains to ALJ Barto's articulation of the RFC. A

claimant's RFC represents his "maximum remaining ability to do sustained work activities in an

ordinary work setting on a regular and continuing basis" despite his medical impairments. SSR

96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted); *see* 20 C.F.R. § 416.945. It is

a factual finding "made by the Commissioner based on all the relevant evidence in the

[claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per

curiam), and it must reflect the combined functionally limiting effects of impairments that are

supported by the medical evidence or the claimant's credible reports of pain or other symptoms,

*see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015). The ALJ's RFC assessment must

"include a narrative discussion describing" how medical facts and nonmedical evidence

"support[] each conclusion," *Mascio*, 780 F.3d at 636, and explaining why he discounted any

"obviously probative" conflicting evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567

15

F.2d 258, 259 (4th Cir. 1977). This discussion should "build an accurate and logical bridge from

the evidence to [his] conclusion," *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting

*Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)), that the claimant retains a certain ability to

sustain work-related activities, *Mascio*, 780 F.3d at 636–37. "In other words, the ALJ must both

identify evidence that supports his conclusion and build an accurate and logical bridge from that

evidence to [the] conclusion" that the claimant is not disabled. *Woods v. Berryhill*, 888 F.3d 686,

694 (4th Cir. 2018) (alterations omitted).

a.      *Severity of Symptoms*

In challenging ALJ Barto's RFC, John P. argues that the ALJ failed to articulate any

specific reasons why he did not find John P. fully credible, and as such, his credibility analysis

was insufficient. Pl.'s Br. 3, 5. I agree. In conducting a credibility analysis, the ALJ must give

*specific* reasons, supported by "references to the evidence," for the weight assigned to the

claimant's statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct.

21, 2013), and the reasons for discounting a claimant's subjective complaints must be both

legally adequate and supported by substantial evidence in the record, *see Mascio*, 780 F.3d at

639; *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (per curiam) (citing

*Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)). The ALJ found that John P. had

several severe mental impairments, including major depressive disorder, social anxiety disorder,

and panic disorder. R. 22. These impairments are well documented in the record. *See, e.g.*, R.

610, 656, 660, 670, 675, 681, 689. The ALJ concluded that these impairments could reasonably

be expected to cause John P.'s alleged symptoms. R. 27. Given this conclusion, the ALJ was

required to "evaluate the intensity, persistence, and limiting effects of [John P.'s] symptoms to

determine the extent to which they limit[ed]" his ability, *Lewis*, 858 F.3d at 866, to work on a

regular and continuing basis, *see Mascio*, 780 F.3d at 636–37, 639. ALJ Barto simply failed to conduct this evaluation, and the omission is not harmless. *See* R. 27–31 (concluding that John P.'s statements describing allegedly debilitating depression and anxiety symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [his] decision," but failing to articulate any specific, legally adequate reason why those statements were inconsistent with other relevant evidence in the record).

John P. regularly reported crippling anxiety that resulted in him avoiding public places, significant depression that affected his mood, frequent panic attacks, and passive endorsement of suicidal thoughts. *See, e.g.*, R. 608 (reporting that he did not go to public places or socialize with others because of anxiety); R. 629 (endorsing passive, but unformed, suicidal thoughts because of depression); R. 649 (describing a major panic attack when trying to use public shuttle service to get to doctor's appointment); R. 691 (reporting reliance on heavy doses of Klonopin just to leave his house or deal with visitors). John P. also reported significant memory deficits and difficulty concentrating. *See, e.g.*, R. 48, 54, 254, 256, 409. Observations from his providers document these memory and concentration deficits, his reliance on powerful medications, and the symptoms of his depression and anxiety. *See, e.g.*, R. 649 (observations of short-term memory deficits during clinical interview with Ms. Repaske); R. 651–52 (displaying impaired memory and decision making, poor insight, and decreased concentration on mental status examination with Dr. Urban); R. 681 (Dr. Urban noting that John P. did not recall "any part of [the] discussions from last session"); R. 689–90 (Dr. Buerlein's remark that "no one needs [as] much benzodiazepine" as John P. reported taking to deal with normal stressors and concluding that John P. needed "assistance from psychiatry if his anxiety [was that] bad"); R. 693 (Dr.

Buerlein observing that John P. was very anxious appearing and prone to lose his train of thought easily).

The ALJ briefly summarized John P.'s characterization of his symptoms and noted that John P. was "cooperative and responsive during his appointments." R. 25.[2] The ALJ then summarily concluded that John P. had moderate difficulties with social functioning and concentration, persistence, or pace. R. 25. The ALJ next acknowledged John P.'s reports of "suicidal ideation, lack of concentration and focus, problems with comprehension, and trouble with memory," as well as his panic attacks, aversion to going out in public or socializing, trouble sleeping, limited ability to do household chores, inability to handle stress or changes in routine well, side effects from medication causing lack of focus and energy, and avoidance of driving because he lacked focus. R. 27. The ALJ found that these allegations were "partially consistent with the evidence of record," but later concluded that John P.'s statements were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.* Overall, ALJ Barto concluded that his step-three findings of moderate limitations and John P.'s report of symptoms translated to limitations to "simple, routine tasks with occasional contact with supervisors, coworkers, and the public" and performance of "jobs in a static workplace with infrequent changes in tasks or processes that are explained to him in advance" in the RFC. R. 26.

ALJ Barto did not, however, explicitly weigh John P.'s report of symptoms against any other evidence in the record to explain why John P.'s allegations were not entirely credible or provide *any* specific reason why he concluded that John P.'s symptoms were not fully credible.

---

[2] This finding is not entirely accurate. One provider at UVA entered the examination room and witnessed John P. arguing with a "pharmacy regarding the filling of his next set of prescriptions." R. 662. Dr. Buerlein also noted that John P.'s behavior had been "relatively erratic at his other doctor visits" with other providers at UVA. R. 691.

Indeed, the ALJ's analysis suggests that he found the medical evidence largely supported John P.'s report of symptoms, but he nonetheless fashioned RFC limitations that on their face did not fully reflect those symptoms and the objective medical evidence. Moreover, the conclusory explanation of the RFC findings that ALJ Barto did provide does not rectify his error. The ALJ noted that John P.'s "consistent complaints of poor energy and objective findings of impaired concentration support[ed] a finding that the claimant would be limited to unskilled work," John P.'s "complaints of anxiety in social situations support[ed] a limitation his ability to interact with others," and "[t]he objective findings of the ability to respond adequately to simple situations, average intelligence, appropriate orientation, cooperative presentation, and positive response to changes in medication support a finding that the claimant could perform simple, routine, unskilled substantial gainful activity." R. 28. But, a limitation to unskilled work does not by itself accommodate a moderate impairment in maintaining concentration, persistence, or pace. *Mascio*, 780 F.3d at 638. John P.'s allegations of crippling social anxiety suggest a greater restriction than to occasional interaction with others. Moreover, the ALJ's citation to selected portions of treatment notes provides scant support for his conclusions. Some of these findings are not entirely accurate. *See supra* note 2 (contradicting finding of cooperative presentation); *see, e.g.*, R. 403, 524, 599, 660 (noting limited or no positive response to mental health medications or medication adjustments). Others, such as John P.'s average intelligence and appropriate orientation, serve the limited purpose of providing support for John P.'s ability to perform simple, routine work. *Cf. Lewis*, 858 F.3d at 869 (criticizing the ALJ for failing to explain how the claimant's "normal gait [bore] any nexus to her complaint of chronic shoulder pain"). Thus, substantial evidence does not support the ALJ's assessment of John P.'s report of symptoms stemming from his mental impairments.

On remand, the ALJ must take care to evaluate all the relevant evidence, including that pertaining to John P.'s physical impairments, and sufficiently explain the reasons for his conclusions regarding John P.'s statements about his symptoms and limitations. *See Lewis*, 858 F.3d at 870 (citing *Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir. 2013)) ("[T]he ALJ failed to adequately explain the reasons for denying Lewis benefits given her extensive medical history, thus precluding our ability to undertake the 'meaningful review' with which we are tasked on appeal."); *see also Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (per curiam) ("The ALJ must evaluate the record fairly. Thus, although the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling. Otherwise, it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence." (internal citations omitted)).

### b.   Opinion Evidence

John P. also challenges ALJ Barto's evaluation of the opinion evidence, particularly that of Dr. Romano. Pl.'s Br. 3–5. The ALJ must weigh each "medical opinion" in the claimant's record. *See* 20 C.F.R. § 416.927(c). Medical opinions are statements from "acceptable medical sources" that reflect the source's judgments about the nature and severity of the claimant's impairment, including his symptoms, diagnosis and prognosis, functional limitations, and remaining abilities. *Id.* § 416.927(a)(1).

In his decision, ALJ Barto assigned Dr. Romano's medical opinion great weight. R. 29–30. Dr. Romano's opinion nevertheless suggested greater limitations that those reflected in ALJ Barto's RFC determination. She found that John P.

> would not have difficulty following simple and routine task demands and would likely have difficulty completing complex tasks even under supervision. His ability to maintain regular attendance in the workplace, perform work activities on a consistent basis, and complete a normal workday or workweek without

> interruptions appear[ed] to be impaired. His ability to interact with coworkers and the public, as well as coping with routine stressors encountered in [a] competitive workplace, appear[ed] to be impaired. [His] prognosis [was] poor given his history; however, [it] would be more favorable if he were to resume counseling. Given these findings, [John P.'s] complaint of functional impairment appear[ed] to be consistent at [that] time. Should [he] be awarded disability benefits, he may require assistance to manage his funds appropriately on his own.

R. 611. Additionally, John P. had "the ability to initiate and sustain social connections with others," but he was "not capable of adequate insight and judgment." R. 610. Despite finding this opinion "well supported," ALJ Barto's mental RFC determination only limited John P. to simple routine tasks with occasional contact with others and a static workplace with infrequent changes explained in advance, R. 26. The ALJ acknowledged portions of Dr. Romano's opinion, and he explained which of Dr. Romano's findings translated into his RFC determination:

> Dr. Romano's exam shows that the claimant was cooperative, well groomed, attentive, and had good memory, all of which supports that he could perform simple routine tasks. The reports as well as his treatment notes show social anxiety, disturbance in attention and concentration, low energy, and decreased motivation, supporting a limitation in the ability to interact with others and perform work activities on a consistent basis.

R. 29–30.[3] The ALJ's conclusion has a number of flaws, however.

First, despite assigning her opinion great weight, the ALJ did not explain why he credited certain portions of Dr. Romano's opinion, but not others, such as coping with routine stressors, maintaining regular attendance, consistently performing work activities, and completing a normal workday or workweek. Second, John P.'s attention and concentration problems, low energy, and decreased motivation do not clearly translate to the ALJ's RFC limitation to a static workplace with infrequent changes in tasks that are explained in advance. The ALJ was required to provide a logical explanation linking Dr. Romano's findings to his RFC determination.

---

[3] The ALJ reached a nearly identical conclusion on the opinions of the DDS psychological consultants. *See* R. 30.

21

*Woods*, 888 F.3d at 695 ("An ALJ must include a narrative discussion describing how the evidence supports his explanation of the varying degrees of weight he gave to differing opinions concerning the claimant's conditions and limitations." (brackets and internal quotations omitted)). Third, and most significantly, the RFC does not reflect the degree of limitation found by Dr. Romano. For example, although Dr. Romano noted John P. was "impaired" in a number of areas, but did not say whether that impairment was severe or mild, [4] she did indicate that his prognosis was poor and remarked that John P.'s "complaint[s] of functional impairment appear[ed] to be consistent at [that] time," R. 611. John P. told Dr. Romano about his panic attacks, depressed moods, difficulty concentrating, history of suicide attempts, and social anxiety that kept him house-bound nearly all of the time. R. 608. Considering John P.'s report of symptoms, Dr. Romano's extensive findings of restrictions, her assessment that his complaints of impairment seemed consistent, and her opinion that John P.'s prognosis was poor, it follows that the ALJ did not adequately account for the limitations identified in her opinion, despite giving it great weight. To be sure, the ALJ was not required to adopt every aspect of Dr. Romano's opinion. *Cf. Bacnik v. Colvin*, No. 1:12-CV-801, 2014 WL 3547387, at *4 n.7 (M.D.N.C. July 17, 2014) ("An ALJ is not required to adopt every opinion in a non-examining medical expert's report, even when according the report great weight overall."). But in this case, the ALJ needed to explain why he credited certain limitations and not others. *See Warren v. Astrue*, No. 2:08cv3, 2008 WL 3285756, at *11 (W.D. Va. Aug. 8, 2008) ("The ALJ's decision cannot be supported

---

[4] After noting that Dr. Romano did not quantify the degree of impairment, the ALJ interpreted her opinion as identifying non-disabling limitations. R. 29–30. That interpretation is questionable given Dr. Romano's observations, prognosis, and recommendation regarding John P.'s management of funds if he were awarded disability. If, as it seems, the ALJ was unsure about the degree of limitation, he could have (and here should have) requested additional information from Dr. Romano. *See* 20 C.F.R. §§ 416.919p(b), 416.920b(c)(1). The administrative record was otherwise sufficient for the ALJ to render a decision.

by substantial evidence when he fails to adequately explain his rationale for rejecting [parts of]

the opinions of those whom he otherwise gave great weight to in arriving at his decision.").

Additionally, although not directly challenged, I note that the ALJ's evaluation of the

DDS opinions regarding John P.'s physical functioning was flawed. The most obvious example

was ALJ Barto's failure to reconcile the different handling restrictions contained in Dr.

Greenberg's and Dr. Kadian's opinions. On initial review, Dr. Greenberg concluded that John P.

could use his bilateral hands only occasionally for handling because of limited range of motion

in the hands. R. 112–13. On reconsideration review, Dr. Kadian concluded that John P. could use

his bilateral hands for frequent handling because of hand cramps and decreased range of motion.

R. 130–31. ALJ Barto gave both of these opinions "great weight," R. 30–31, and then concluded

that John P. could use his bilateral upper extremities for frequent handling, R. 26. ALJ Barto,

however, explained his decision to afford both these opinions, which are not entirely consistent,

great weight only by noting that John P. had "some decreased flexion in the fingers." R. 30.

ALJ Barto's failure to explain why he adopted the frequent handling limitation from Dr.

Kadian's opinion over the occasional handling limitation from Dr. Greenberg's opinion is not a

trivial omission. In discussing manipulative limitations, Social Security Ruling ("SSR") 96-9p

instructs that "[m]ost unskilled sedentary jobs require good use of both hands and fingers,"

including for "repetitive hand-finger actions" and "[f]ine movements of small objects." 1996 WL

374185, at *8. SSR 96-9p also instructs that "[a]ny *significant* manipulative limitation of an

individual's ability to handle and work with small objects with both hands will result in a

significant erosion of the unskilled sedentary occupational base."[5] *Id.* The SSR further explains

---

[5] Although SSR 96-9p does not define "significant manipulative limitation," *id.*, a limitation to
"'frequent' means occurring from one-third to two-thirds of the time," and a limitation to "'occasionally'
means occurring from very little up to one-third of the time," SSR 83-10, 1983 WL 31251, at *5–6 (Jan.
1, 1983).

that "[w]hen the limitation is less significant, especially if the limitation is in the non-dominant hand, it may be useful to consult a vocational resource," such as a VE. *Id.* Here, although his testimony was somewhat unclear, the VE testified that certain sedentary jobs could be performed with a limitation to frequent handling, but he was not asked how a limitation to occasional handling would impact a person's ability to perform those jobs. *See* R. 63–65. Given the SSR's instruction that bilateral handling limitations "result in a significant erosion of the unskilled sedentary occupational base," *id.*, and the ALJ's lack of any meaningful discussion why he chose the less restrictive handling limitation despite assigning both Dr. Greenberg's and Dr. Kadian's opinions the same "great weight," his discussion of these opinions is not supported by substantial evidence. On remand, the ALJ must take care to consider the entirety of each medical opinion and explain the conclusions he draws from each.

2.     *Step-Five Challenge*

John P. also argues that ALJ Barto erred in relying on the VE's testimony at step-five. He contends that "[b]ecause the hypothetical questions were not based on complete, specific findings as to all the non-exertional limitations . . . , the testimony of the vocational expert about the existence of jobs is not valid and proper evidence of the existence of jobs which [John P.] could have performed." Pl.'s Br. 4. This argument is essentially an extension of the RFC challenge, for if substantial evidence does not support an ALJ's RFC determination because it does not reflect all the claimant's impairment-related functional limitations, then a hypothetical question mirroring the RFC will also be insufficient. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) ("In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of [the] claimant's impairments." (internal

citations omitted)); *cf. Saunders v. Colvin*, No. 7:14cv96, 2015 WL 5674901, at *10 (W.D. Va.
Sept. 25, 2015) ("Hypothetical questions should adequately reflect the plaintiff's RFC as found
by the ALJ and supported by sufficient evidence." (citing *Fisher v. Barnhart*, 181 F. App'x 359,
364 (4th Cir. 2006) (per curiam))). Because I conclude that ALJ Barto's RFC finding did not
adequately reflect all of John P.'s limitations, I must also conclude that substantial evidence does
not support the ALJ's step-five determination that John P. was not entitled to disability benefits.
*Cf. Pearson v. Colvin*, 810 F.3d 204, 209–210 (4th Cir. 2015) (noting certain circumstances
under which a VE's "testimony cannot provide substantial evidence for a denial of benefits"
under the Act).

One final point regarding the hypothetical questions propounded to the VE merits
mention because the error could occur on remand, *see Woods*, 888 F.3d at 694. In a series of
questions to the VE, the ALJ added, and then struck, certain restrictions of the hypothetical
individual. R. 62–64. When the ALJ changed the hypothetical from "light" work to "sedentary"
work, he did not fully restate the applicable restrictions even though in the preceding questions
he had presented multiple conflicting scenarios relating to the hypothetical person's dominant
and non-dominant manipulative capabilities. This line of questioning created a confusing
hypothetical. On remand, the ALJ should take care to clearly articulate hypothetical questions so
the VE can provide adequate testimony and any reviewing court can readily ascertain the basis
for the ALJ's RFC and attendant step-five finding.

## IV. Conclusion

For the foregoing reasons, I find that substantial evidence does not support the
Commissioner's final decision. Accordingly, I respectfully recommend that the presiding District
Judge **GRANT** John P.'s Motion for Summary Judgment, ECF No. 14, **DENY** the

Commissioner's Motion for Summary Judgment, ECF No. 17, **REVERSE** the Commissioner's final decision, **REMAND** this case for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** the case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Norman K. Moon, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: August 20, 2018

Joel C. Hoppe
United States Magistrate Judge